UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


NICHOLAS GIFFORD,

          Plaintiff,

v.                                    Civil Action No. 2:23-cv-00332

WEST VIRGINIA DIVISION OF
CORRECTIONS AND REHABILITATION,
DEREK DENNIS,
KENDALL GOODEN, and
JOHN DOE,

          Defendants.


MEMORANDUM OPINION AND ORDER


          Pending is defendant West Virginia Division of

Corrections and Rehabilitation (the "Division of Corrections")

and Correctional Officer Dennis' Motion for Summary Judgment

(ECF No. 31), filed September 1, 2023.  Defendant Correctional

Officer Gooden and the unidentified John Doe did not participate

in the motion and defendant Division of Corrections has since

been dismissed from this action, so that the only movant is now

Officer Dennis.[1]  Plaintiff Gifford filed a Memorandum in

Opposition (ECF No. 33) on September 15, 2023, and defendant

---

[1] The Division of Corrections was dismissed from this action
pursuant to its Motion to Dismiss (ECF No. 29) after the
briefings on the Motion for Summary Judgment were complete.  See
Mem. Op. & Order Granting Mot. to Dismiss, ECF No. 36.

Dennis replied (ECF No. 35) on September 22, 2023.  This matter, being fully briefed, is ripe for adjudication.

<u>I. BACKGROUND</u>

This action arises from an incident in which the defendant officers allegedly used excessive force against the plaintiff, Nicholas Gifford, who was an inmate at Huttonsville Correctional Complex at all times relevant to this action.  <u>See</u> Compl. ¶ 1, ECF No. 1-2.  The plaintiff alleges that, on or about January 18, 2021, Correctional Officers Kendall Gooden, Derek Dennis, and an unnamed Officer John Doe were angry at plaintiff because of an inconclusive alcohol screening.  <u>See</u> <u>id.</u> ¶ 9.  The officers allegedly told the plaintiff that they were taking him to lock-up.  <u>See</u> <u>id.</u>  The plaintiff says that he did not "resist, become combative or insubordinate," but that he told the officers that he did not believe lock-up was proper for an inconclusive test.  <u>See</u> <u>id.</u> ¶ 10.  The plaintiff says that at this time he requested a shift supervisor but was refused.  <u>See</u> <u>id.</u>  Then, the plaintiff claims, the officers led him into the elevator — where there were allegedly no witnesses and no video cameras — and suddenly and violently assaulted him.  <u>See</u> <u>id.</u>

The plaintiff alleges the assault caused him to lose consciousness, after which he was taken to the medical unit in a wheelchair.  <u>See</u> <u>id.</u> ¶ 12.  He says that the assault resulted in

physical injuries to his head, hands, wrists, and thumb; mental anguish (severe emotional distress); embarrassment; and humiliation.  See id. ¶¶ 11, 18, 20.  The plaintiff further claims that the defendant officers conspired to write false reports of the incident so as "to conceal their own wrongdoing." See id. ¶ 19.

The plaintiff filed a complaint in the Kanawha County Circuit Court on December 22, 2022.  See Compl.  The case was properly removed to this court on April 14, 2023.  See Defs.' Notice of Removal, ECF No. 1.  The complaint asserts four causes of action: (I) violation of 42 U.S.C. section 1983, presumably asserted against the defendant officers;[2] (II) outrageous conduct, presumably asserted against the defendant officers; (III) vicarious liability as to the Division of Corrections; and (IV) fraud and conspiracy to commit fraud, presumably asserted against the defendant officers.  See Compl. ¶¶ 15–31.

_____

[2] Despite naming four defendants (the Division of Corrections, Officer Dennis, Officer Gooden, and an unidentified Officer John Doe), the complaint fails to identify which defendant or defendants Counts I, II, and IV are presented against.  The court has since dismissed the Division of Corrections from this action pursuant to the Division's Motion to Dismiss.  See Mem. Op. & Order Granting Mot. to Dismiss.  As it did in that order, the court construes Counts I, II, and IV as being asserted against the defendant officers only.  Count III (vicarious liability) was asserted against the Division alone and is now moot.

During the early stages of discovery, the moving defendants say that the plaintiff produced a grievance form that he filed with the Division of Corrections regarding the alleged incident. See Defs.' Mem. in Supp. 2, ECF No. 32.  The plaintiff's grievance, attached as Exhibit A to the Motion for Summary Judgment, consists of two sheets of paper: (1) the pre-printed grievance form filled in by the plaintiff and the responding correctional authorities; and (2) a single, one-sided piece of paper with the plaintiff's handwritten description of the alleged incident. See Gifford Grievance, Mot. for Summ. J. Ex. A, ECF No. 31-1.

The Division of Corrections and Officer Dennis filed this Motion for Summary Judgment and a Memorandum in Support (ECF No. 32) on September 1, 2023, arguing that the plaintiff failed to exhaust his administrative remedies as required by law and is thus precluded from bringing the present action.  See Mot. for Summ. J.  The motion includes the Gifford Grievance (Exhibit A), the Affidavit of Lawrence Pettey (Exhibit B), and the Division of Corrections Policy Directive 335.00 ("Inmate Grievance Procedure") (Exhibit C).  The plaintiff filed his Memorandum in Opposition (ECF No. 33) on September 15, 2023, responding that he exhausted his administrative remedies by complying with the grievance policy and, if the grievance is

non-compliant, it was because it was rendered unavailable to him.  The defendants filed their reply (ECF No. 35) on September 22, 2023, saying that administrative remedies were available, and the plaintiff failed to exhaust them.  The grievance form and Pettey affidavit are the only pieces of evidence offered by either party.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Courts do not resolve disputed facts, weigh the evidence, or make determinations of credibility.  See Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  "Material" facts are those necessary to establish the elements of a party's cause of action.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A dispute of material fact is "genuine" if, in viewing the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  See Anderson, 477 U.S. at 248.  The moving party is entitled to summary

judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  See William v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247–48 (emphasis in original).  "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"  Id. at 248 (quoting First Nat'l Bank of Ariz. v. City Servs. Co., 391 U.S. 253 (1968) (quoting Fed. R. Civ. P. 56(e))); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 584 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts").  A non-movant who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will lose at summary judgment because "the nonmoving party has failed to make a sufficient showing on an essential element of her case with

respect to which she has the burden of proof." <u>Celotex Corp. v.</u>
<u>Catrett</u>, 477 U.S. 317, 322–23 (1986).

<u>III. ANALYSIS</u>

A.   <u>The Federal and West Virginia Prison Litigation Reform Acts</u>

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §
1997e(a), prescribes that "a prisoner confined in any jail,
prison, or other correctional facility" cannot bring a suit
regarding prison conditions "until such administrative remedies
as are available are exhausted."  24 U.S.C. § 1997e(a); <u>see</u> <u>also</u>
<u>Woodford v. Ngo</u>, 548 U.S. 81, 90–91 (2006); <u>Jones v. Bock</u>, 549
U.S. 199, 211 (2007) ("There is no question that exhaustion is
mandatory under the PLRA and that unexhausted claims cannot be
brought in court.").  The phrase "prison conditions" has been
interpreted broadly to include "all inmate suits about prison
life, whether they involve general circumstances or particular
episodes, and whether they allege excessive force or some other
wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 523 (2002).  The PLRA
is thus an exception to the general rule that a person bringing
a section 1983 claim need not first exhaust her administrative
remedies.  <u>See Porter</u>, 534 U.S. at 523.

Under the PLRA, an inmate exhausts administrative
remedies by complying with the policy of the relevant agency.

See Woodford, 548 U.S. at 90–91.  Compliance with an agency's procedures "'means using all steps that an agency holds out, and doing so properly (so that the agency addresses the issues on the merits)' . . . [including] compliance with an agency's deadlines and other critical procedural rules."  Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original); see also Woodford, 548 U.S. at 90–91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.").  The procedural rules with which an inmate must comply are determined by the grievance policies of the facility in which he is incarcerated.  See Jones, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

The West Virginia Prison Litigation Reform Act ("West Virginia PLRA"), West Virginia Code section 25-1A-2, parallels the federal PLRA and similarly requires that administrative remedies be exhausted before filing a civil action under state law.[3]  See W. Va. Code § 25-1A-2(a), (a)(i), (c).  The procedure

---

[3] The West Virginia PLRA formerly exempted from the exhaustion requirement actions involving violence, sexual assault, and sexual abuse.  See W. Va. Code § 25-1A-2(a) (exempting violence,

for exhausting administrative remedies under the West Virginia PLRA is the same as under the federal PLRA – the inmate must follow the policy of the facility in which he is incarcerated. See W. Va. Code § 25-1A-2.

"[F]ailure to exhaust is an affirmative defense under the PLRA . . . [and] inmates are not required to specially plead or demonstrate exhaustion in their complaints." See Jones, 549 U.S. at 216; see also Custis v. Davis, 851 F.3d 358, 363 (4th Cir. 2017). The burden is on the defense to raise and support the issue of exhaustion. See Jones, 549 U.S. at 216.

"Under [the PLRA], the exhaustion requirement hinges on the 'availab[ility] of the administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." Ross v. Blake, 578 U.S. 636, 642 (2016). The Supreme Court described the following circumstances in which an administrative remedy is unavailable: (1) "when

---

sexual assault, and sexual abuse from the definition of "ordinary administrative remedy"); see also White v. Haines, 217 W. Va. 414, 422 (2005). In 2013 the West Virginia PLRA was amended to require exhaustion in all cases. See W. Va. Code. § 25-1A-2(a)(i) ("[N]o inmate shall be prevented from . . . bringing a civil or criminal action alleging violence, sexual assault or sexual abuse, after exhaustion of administrative remedies.") (emphasis added); see also Baker v. Hammons, No. 2:15-cv-13849, 2016 WL 538481, at *3 (S.D.W. Va. Feb. 9, 2016); Miller v. Rubenstein, No. 2:16-cv-05637, 2018 WL 736044, at *6 (S.D.W. Va. Feb. 6, 2018).

(despite what regulations or guidance materials may promise) [the remedy] operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates," id. at 643 (citing Booth v. Churner, 532 U.S. 731, 738 (2001)); (2) "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use," id. at 643–44 (citing Goebert v. Lee Cnty., 510 F.3d 1312, 1323 (11th Cir. 2007); Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008)); and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," id. at 644.

Thus, to bring this action, the plaintiff must have exhausted his available administrative remedies by properly filing and appealing a grievance as set forth in the Policy Directive of the Division of Corrections.  This is true for both his federal claims, per the federal PLRA, and his state claims, per the West Virginia PLRA.  Since failure to exhaust is an affirmative defense, the defendants bear the burden of proving that the plaintiff failed to exhaust the available remedies.

B.   The Division of Corrections' Grievance Policy

At the Huttonsville Correctional Complex, where the plaintiff was incarcerated and where the alleged incident occurred, the applicable rule governing administrative remedies

is the Division of Corrections' Policy Directive 335.00, "Inmate Grievance Procedure." <u>See</u> Policy Directive 335.00 §§ IV–VI. The Policy Directive sets forth a strict timeline for filing and appealing grievances. <u>See</u> <u>id.</u> Grievances may be submitted in any of the following ways:

> in writing by US mail, by depositing in DCR [Division of Corrections] grievance boxes located in each DCR facility, or by handing the grievance to a DCR employee, who is per policy in a position to accept the grievance.

<u>Id.</u> § II. The Policy Directive provides that, specifically for appeals to the Commissioner, the grievance "shall be mailed by the inmate to the Commissioner by first class mail." <u>Id.</u> § VI.

Inmates have fifteen days from "any occurrence that would cause him/her to file a grievance" to file a grievance "utilizing a grievance form." <u>Id.</u> § IV. "For the purposes of this policy ['days'] shall mean working days, exclusive of weekends or state holidays." <u>Id.</u> § Definitions. "The grievance form shall initially be submitted by the inmate to his/her Unit Manger or the Director of Inmate Services at facilities where Unit Managers are not assigned." <u>Id.</u> § IV.B.[4]

---

[4] When discussing the initial filing of the grievance, the policy reiterates that, in addition to submitting the grievance to the Unit Director, the inmate "may also submit grievances to a correctional officer, via lock box, or US mail." <u>Id.</u> § IV.B.

The grievance form has six sections, all on a single sheet of paper; the first section is to be filled out and signed by the inmate filing the grievance and prompts the inmate to describe the nature of the grievance (he may attach a single 8.5 x 11 sheet of paper with writing on one side, if necessary to fully describe the incident) and the relief sought.  The remaining five sections are designed as follows as the grievance is reviewed, appealed, and acted upon:

(1) initial review by the Unit Manager;

(2) appeal to the Superintendent (also referred to as the Warden/Administrator);[5]

(3) action by the Superintendent;

(4) final appeal to the Commissioner; and

(5) action by the Commissioner.

Once the grievance is in the hands of the Unit Manager, "an answer to the grievance [shall be] provided back to the inmate within five (5) days." Id. § IV.E.  If, upon receipt of the Unit Manager's response, the inmate is not satisfied that the issue has been resolved, he has five days "from delivery of

---

[5] The grievance form used by the plaintiff is the February 1, 2014 version and refers to the "Warden/Administrator," whereas the February 15, 2020 version, attached as a sample to the Policy Directive, refers to the "Superintendent." See Pol. Dir. Attach. 1.  The court uses the "Superintendent" where the parties interchangeably use "Superintendent" or "Warden/Administrator," which all refer to the same office.

the response to his/her grievance" to appeal the issue to the Superintendent.  Id. § V.

The second section of the grievance form is for the response by the Unit Manager or Director of Inmate Services. The Unit Manager is prompted to mark the grievance as either accepted or rejected,[6] the date, the reason for rejection, the response on the merits if accepted, and to affix his signature. In the third section, the inmate can mark either that the grievance has been resolved, or that he is appealing the grievance to the Superintendent; the latter is done by initialing, dating, and signing.

The fourth section of the grievance form is for appeal by the inmate to the Superintendent (the first level of appeal). "The Superintendent/designee shall respond to the appeal, using the [fourth section of the] grievance form, within five (5) days."  Id. § V.C.  Here, the Superintendent (or a designee) marks the grievance as accepted or rejected, signs and dates it, and describes why the grievance was rejected or what the

---

[6] A grievance is "accepted" when it complies with the regulations and is suitable for a ruling on the merits, and is "rejected" when the inmate has failed "to follow the procedural requirements for filing such [a] grievance."  Policy Directive § Definitions.  A "denial" means that the grievance was reviewed on the merits and the relief requested was denied.  See generally Policy Directive § 335.00.

response on the merits was if accepted (i.e., "remand to unit for further action," "affirm unit and/or deny grievance," "grant the grievance as specified").  Below this, the inmate in the fifth section initials the grievance as resolved or as being appealed to the Commissioner.  That is, upon receipt of the Superintendent's response the inmate, if he is still not satisfied that the issue has been resolved, may appeal the decision to the Commissioner of the Division of Corrections and Rehabilitation "within five (5) days" of receipt of the Superintendent's response or when "the time for the response [by the Superintendent] has passed."  Id. § IV.  The inmate does so by initialing and signing.

The sixth and final section is for action by the Commissioner (the final level of appeal).  The Commissioner (or a designee) marks the grievance as accepted or rejected, dates the action taken, and provides a reason for rejection or, if accepted and responding on the merits, marks whether the Superintendent is being affirmed and the grievance is denied, or "other, memo attached," and then signs and dates it.  "The Commissioner/designee shall respond to the appeal, in writing, within fifteen (15) days."  Id. § VI.C.

At each stage a grievance may be "accepted" and reviewed on the merits or "rejected" for failing to comply with

14

the Policy Directive – including for being untimely filed or
appealed.  See id. § IV.D.  "An inmate may appeal a rejection in
the same manner as a decision, but the scope of the appeal is
limited only to the propriety of the rejection and not the
merits of the grievance."  Id.  Per the Policy Directive,
exhaustion is achieved by "[s]ubmitting an accepted grievance
and properly appealing an accepted grievance fully and receiving
a final response thereto by the Commissioner.  Rejections do not
constitute exhaustion."  Id. § Definitions.  On the issue of
exhaustion, the Policy Directive further states that "[o]nly the
grievance filed within the central office shall be indicative of
whether the inmate has exhausted administrative remedies."  Id.
§ I.A.

     Plaintiff Gifford dated his grievance January 28,
2021, attached a sheet of paper describing the incident,
described the relief sought (he requested, among other things,
an investigation, installation of video cameras in blind spots,
and the collection of relevant camera footage for future
viewing), and his signature, "Nicholas Gifford."  The Unit
Manager marked the grievance as accepted (meaning it complied
with the grievance policy), dated it February 8, 2021, described
the response on the merits as "FWD to GP-GA shift, See
Attached," and signed it.  See id.  The described attachment was

not provided to the court.  The plaintiff initialed ("N.G.")
that he was appealing the Unit Manager's decision to the
Superintendent (though he did not sign his name), dated February
12, 2021.

Near the space for appeals to the Superintendent on
the grievance form, the form is stamped as received by the
Huttonsville Correctional Center and Jail Office of the
Superintendent on February 16, 2021.  The grievance is marked as
accepted, dated February 24, 2021, signed by two illegible
marks, and at the line for "Response on Merits," the box "Affirm
unit and/or deny grievance" is marked.  The plaintiff initialed
("NG") that he was appealing to the Commissioner though he did
not sign his name and date it.

The Superintendent's Office stamped the appeal
received on March 2, 2021.  The affidavit of Lawrence Pettey,
the Inmate Grievance Coordinator for the Division of
Corrections' central office, avers that the Commissioner did not
receive the appeal until March 10, 2021.  See Pettey Aff., Mot.
for Summ. J. Ex. B, ECF No. 31-2.  In the space reserved for
action by the Commissioner there is a sticker from the Office of
the Commissioner that says "Rejected."  On the sticker is
written "untimely to this level."  The grievance form is marked
as rejected and dated March 11, 2021.

February 24, 2021, the date the Superintendent denied the appeal, was a Wednesday, and March 2, 2021, the date the Superintendent received the appeal again was a Tuesday.  There were thus two weekend days in between.  Consequently, the appeal to the Commissioner was received by the Superintendent within the five days allotted for the appeal.  The question remains as to whether that was sufficient in this instance.

C.    <u>Whether Plaintiff Exhausted Available Remedies</u>

The defendant's first argument is that the plaintiff did not properly fill out the appeal to the Commissioner because he did not sign and date it.  <u>See</u> Mem. in Supp. 2.  The grievance form does not have a place for the date or a request that the inmate affix the date next to his initials at this stage.  Indeed, in the space below the line on which the inmate is to initial his appeal to each the Superintendent and the Commissioner it is indicated that it is to be used by the inmate in the event that the Unit Manager or the Superintendent, as the case may be, did not respond; as both responded, the plaintiff was not required to sign and date this lower part of either of his appeal sections.

The true issue emerges with the final section of the grievance form, reserved for appeals to the Commissioner, which is stamped as received by the Superintendent's Office on March

2, 2021, and marked as rejected by the Commissioner for being untimely received and dated by the Commissioner's Office as March 11, 2021.  Mr. Pettey avers that the plaintiff's grievance was received by the Commissioner's Office on March 10, based on the office's Inmate Appeals and Responses log.  See Pettey Aff.

The defendant interprets the various markings on the grievance form at the Commissioner level to mean that the plaintiff "apparently sent an appeal of the [Superintendent]'s decision back to the Office of the Superintendent."  See Mem. in Supp. 6.  The defendant says that because the Superintendent affirmed the Unit Manager's decision on February 24, and the Commissioner did not receive the appeal until March 10, the plaintiff exceeded the five-day time limit to appeal, and the appeal was properly rejected on March 11.  See id.  "Based on Plaintiff's own failure to properly send his grievance appeal to the Commissioner initially, the earliest date Plaintiff could have sent his appeal to the Commissioner was March 2, 2021, which still fails to comply with the prescribed procedure." Reply 4–5.

The plaintiff contends that he complied with all grievance and appeal procedures and any errors are the responsibility of the defendants.  See Mem. in Opp. 1.  If the final grievance appeal was noncompliant, he says, it is because

18

"his attempts were thwarted by the [Department of Corrections]
staff" and the remedy was thus rendered unavailable to him.  The
plaintiff continues:

> [D]efendants are arguing that plaintiff failed
> to properly exhaust his remedies but the
> defendants were clearly responsible for any
> alleged delay in receipt by the Commissioner.
> . . . Had plaintiff mailed the grievance late,
> the defendants surely could and would have
> provided that information to the Court.
> Because the Defendants are responsible for the
> grievance leaving the facility, defendants are
> solely responsible for its timely arrival at
> the central office.

Id. 1–2.  In a footnote, the plaintiff says that "he cannot
control when the facility placed his grievance in the mail and
when the US Postal Service delivers it."  Id. 2 n. 1.

The plaintiff argues that since defendants were
responsible for ensuring the grievance was timely delivered, any
rejection because of delayed receipt should not prevent the
current action.  He quotes the Fourth Circuit: "an
administrative remedy is not considered to have been available
if a prisoner, through no fault of his own, was prevented from
availing himself of it."  Mem. in Opp. 4 (quoting Moore v.
Bennette, 517 F.3d 717, 725 (4th Cir. 2008)).

The court agrees that if the Department of
Corrections' staff were responsible for preventing the
plaintiff's grievance from being timely received by the

Commissioner's Office, the administrative remedy was likely unavailable to the plaintiff.  But the movant does not argue that the remedy would be unavailable if the Division of Corrections or its staff prevented the grievance from being timely sent or received; instead, it is asserted that the delay was the plaintiff's own fault.  <u>See</u> Reply 1, 3.  The movant emphasizes that remedies were available to the plaintiff, as evidenced by the fact that "he <u>utilized</u> those remedies, just untimely."  <u>Id.</u> 3 (emphasis in original).

Neither party describes the grievance process that was employed at the time of the appeal to the Commissioner with sufficient detail to allow the court to determine whether the remedy was made unavailable to the plaintiff or whether the plaintiff failed to timely appeal to the Commissioner.  Both parties assert that their position is clearly supported by the plaintiff's grievance form, but this is not so – at least without additional information about the mailing process, which neither party provides.  The parties do not explain, for example, who is responsible for addressing the grievance when it is being mailed on appeal,[7] and whether the determination that an

_____

[7] Although the Policy Directive says the inmate is responsible for mailing the appeal via first class mail to the Commissioner, neither party discusses this in the briefings.  There also remains the questions of who addresses the envelope, how

appeal is timely is based on when the inmate submits the appeal (hands it to an officer for mailing or places it in the mail or a drop box) or when it is marked as received by the relevant office.  The grievance policy does not speak to these matters and the briefings on this motion do not fill in these lacunae.  Such information is critical to determine whether the appeal was untimely or the remedy was made unavailable.

It is apparent that the plaintiff's grievance was in the hands of the authorities once he appealed the Superintendent's decision because it was again at the Superintendent's office.  If the Superintendent's Office retained the purportedly mis-sent appeal for a considerable amount of time, then the remedy may have been rendered unavailable to the plaintiff.  When the appeal was initially before the Superintendent, it took seven working days for the Superintendent to respond, instead of the five called for by the Policy Directive; the grievance was marked as received on Tuesday, February 16, 2021, and the decision was not dated until Friday, February 24.  If the Superintendent retained the grievance for a similar amount of time when it returned to that

---

frequently the mail is collected, whether it is screened, and so forth.

office, then there was no possible way for the plaintiff to comply with the Policy Directive once it was mis-sent.

Further, neither party explained how the grievance arrived at the Superintendent's Office instead of the Commissioner's Office.  The Policy Directive says that, only for the final appeal to the Commissioner, the inmate is to send the grievance to that office via first class mail.  Yet the Directive does not detail, nor do the parties discuss, how this actually comes about.  When going to the Unit Manager and the Superintendent, the inmate may also hand the grievance to any corrections officer or place it in a drop-box.  If an inmate does this for a final appeal, will the facility knowingly send it to the Superintendent even though it is supposed to go to the Commissioner?  Do the inmates address the envelopes or merely mark that they are grievances on appeal?  These unknown procedures have great bearing on the availability of the grievance appeal in this instance.

Additionally, and not raised by either party, is the fact that the Policy Directive says "[o]nly the grievance filed within the [inmate's central office file] shall be indicative" of exhaustion.  See Policy Directive 335.00 § I.A.  The defendants assert that the plaintiff produced the grievance in discovery.  If the grievance attached to the defendant's motion

was the copy produced by the plaintiff and not the original from the plaintiff's central office file, the original and the markings on it needs to be produced or fully accounted for.

The movant says that the plaintiff "has offered no evidence" for his position and "relies on baseless assertions devoid of any support." Reply 5-6. It is asserted that the plaintiff, as the non-movant challenging the motion for summary judgment, has failed to show that a genuine issue of material facts exists. But the movant fails to appreciate that he bears the burden of proof on the issue of exhaustion. The key question in determining whether summary judgment is appropriate is thus whether the movant has met his burden of showing that no genuine dispute exists as to exhaustion of administrative remedies. The court finds that the movant has not met his burden. The circumstances are so muddled that there remains a genuine issue of material fact as to what in fact took place with respect to the appeal to the Commissioner and summary judgment is thus inappropriate.

## IV.  CONCLUSION

The court ORDERS that the Motion for Summary Judgment be, and it hereby is, DENIED.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: November 28, 2023

John T. Copenhaver, Jr.
Senior United States District Judge